Johnson v. Protective Life Insurance Company Mr. Bala, when you're ready, you've got 13 minutes. Good afternoon, and may it please the Court. My name is Ravi Bala, and I'm with Sussman Godfrey here on behalf of the Plaintiff, Worth Johnson. Protective was not entitled to judgment on the pleadings because Plaintiff offered a reasonable reading of the following policy language. Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience. A reasonable insured could read this language as obligating protective to lower its cost of insurance rates in response to improvements in its expectations as to future mortality experience, which I'll abbreviate as EFME. The complaint alleges that EFME is a mortality calculation that Protective reviews and revises annually. Indeed, EFME is baked into Protective's annual financial reporting, and it impacts Protective's predictions of future cash flows. Since the policy here was issued and during the class period, Protective's EFME has improved. But despite the improvements in EFME, Protective has not lowered the COI rates that the policies say are determined based on that EFME. Courts across the country have held that this set of facts states a claim. The Second Circuit, for example, in Merkin v. Zoom, reversed a grant of a motion to dismiss and held that when a monthly variable rate in a contract is based on an underlying factor, and that underlying factor changes, the monthly variable rate has to change. And a litany of other federal and state courts interpreting COI provisions, including two opinions from Judge Boudry below, have found that it's reasonable to read the language we have here as obligating Protective to lower its COI rates in response to improvements in EFME. Protective is incorrectly reading the policies as a one-way ratchet, allowing it to raise rates when EFME deteriorates, but somehow not obligating it to lower rates when EFME improves. If we accept your reading, would any insured be able to complain that the particular calculation was wrong, or does the company just have to give a rate based on that? So let's say it goes down, the expected costs go down. If the company lowered premiums by 25 cents, would that be at least they had made their decision based on the adjusted COI? It would depend on if you finish your line. It would depend, of course, whether based on is treated as exclusive or not. If based on is treated as exclusive, then the determination of the COI rates or the change in the COI rates based on the change in EFME would need to match the change in some way. Putting precise numbers on it, though, is not something that we've done here. It would ultimately be something for an expert to testify about and analyze. Back to my point a moment ago about Protective's reading of the policy. Protective's one-way ratchet is not the appropriate reading. That's a heads-we-win, tails-you-lose reading of the policies that courts have rejected. Help me with this then. It says the COI rates will not be greater than those on the table of guaranteed maximum rates, dates shown, and policy schedule. How is that a one-way ratchet? Tell me it could go down, not up. Sure. It's a one-way ratchet because Protective's reading is they can raise rates, sure, up to the ceiling when EFME deteriorates. But they're saying they don't have to lower rates when EFME improves. Wait a minute. We're focused on the element in the rate called the COI, right? I'm sorry? The only element in the rate we're talking about is the COI rate, right? We're talking about the cost of insurance rate, yes. Yes. That's all we're talking about, that factor, which is based on other factors. Right. Okay. And this provision says the COI rates will not be greater than those in the table of guaranteed maximum rates shown in the policy schedule. Right. So there's a cap there. There's a cap. That limits Protective's ability to raise rates over the life of the policy. Yes, but they show the maximum rate as being what? It's presented in a table in each policy. Right. And that rate is pulled from an external mortality table. The 1980 table. Correct. And so they say we're never going to go up beyond that rate. I know you want it to go down because the mortalities change from 1980. I don't understand the one-way ratchet because it seems like that puts a cap that it's never going to go up beyond the calculated rate based on 1980. Sure. It's never going to go up beyond the calculated for 1980, right? Right. But it's a one-way ratchet with a cap, I guess. The point is that. Well, the cap is already there because the cap and the rate is the same when it starts. Sure. But the rates don't start at the 1980 CSO mortality level. Okay. What do they start at? They start at a level below that that Protective sets for the particular block of policies. Okay. Go ahead. So back to this heads we win, tails we lose reading of the policies is precisely what the court in PHT versus North American rejected. And it did so at summary judgment. And that I think is a very good decision for the court to look at. It's one that we submitted in our 28J letter because the court there basically read the policies the precise way that we're reading them here. So with all this widespread support for our reading of the policies, it was error for the district court to conclude that as a matter of law, no reasonable insured would read the policies as we do. And at the very least, the policies present an ambiguity that can't be resolved at the pleading stage. There's essentially two interpretive questions here before the court. The first one, which we've already talked a little bit about, is Protective's duty to change the rates in response to changes in EFME. The second question is, what does the word based on mean? Does Protective get to consider factors beyond EFME when it's determining COI rates based on EFME? The duty to change rates, like I said, is something that's found in a lot of court opinions. In addition to the Zoom case and the North American case, McMillan versus Kansas City and Carr versus Kansas City, two cases we cite in our reply brief. But do any of those have the language will be determined? Do any case you cite use the language will be determined? Yes. McMillan versus Kansas City and Carr versus Kansas City both have that. I believe PHT versus North American, the languages are determined, but it's materially the same. And in all those cases, the court found that when a variable rate contract says one thing is based on an underlying factor, and that underlying factor changes, the thing based on the factor has to change. Does it have to be, couldn't the policy be a little more discretionary than you were saying, but your claim might still go through? In other words, do we have to determine that based on means exclusively based on in order for your case to go forward, or could based on mean will have some effect on the number? Right. So our case goes forward under either reading. To start with, the reading of based on is exclusive. We think that's the appropriate reading here based on other uses of the phrase based on within the four corners of the policy, specifically speaking of the max rates provision. The basis of computation section says that the maximum rates are based on the 1980 CSO mortality table. And then about five pages back in the policy, it says that the maximum rates are in fact equal to the 1980 CSO mortality table. So that's within the four corners of all policies. It's an undisputed use of the phrase based on in the exclusive context. If based on is found non-exclusive, which is what protective argues, we still state a claim. And the reason why is even if based on is non-exclusive, protective is not entitled to ignore its EFME. In other words, protective can't have COI rates that are wholly divorced from its changing EFME over the life of the policies. Could do that take into consideration the EFME and still either keep rates at the same level or actually increase them even if the EFME is getting better? There are other factors that could lean in favor of no change or change to the detriment of the insured. Potentially there are, but this would just present a quintessential fact question that could not be resolved at the pleadings. If protective wants to argue that it's going to consider other factors in addition to EFME, and those factors have deteriorated sufficiently to overcome its drastic improvements in EFME, that's an argument they can make, but it has to be done after discovery. And I would just add that the allegations that we've added to the third amended complaint or the proposed third amended complaint show that it's very unlikely that protective would be able to show that. What we've learned in discovery thus far in the case is that those other factors that protective might point to have not deteriorated significantly enough. And I guess as an aside, I am curious, what do you think happened to this third amended complaint? Was it fully resolved? Did the court essentially deny the request? What's your position? Our position is that the district court found that the third amended complaint was futile. That's a decision that this court reviews de novo. The reason for that is footnote one of the district court's opinion, where the district court said that the second amended complaint and the third amended complaint were carbon copies of each other. Then Judge Heikkila went on to say the third amended complaint only adds one allegation. And then what she quoted actually was the heading of a whole new section that we added, which spanned seven pages and 13 different allegations. So I think it was just a mistaken reading of the third amended complaint on behalf of the district court's part. And we do think it was properly submitted. I know protective has some quibbles with the fact that we sought leave in our opposition brief and that we attached the complaint to the opposition brief for the reasons that we've argued in our reply brief. We don't think that's a reason for this court to disregard the third amended complaint. Well, here's another practical question. We don't have your policy here. Johnson's the only plaintiff left. His policy's not attached anywhere, right? It is, Your Honor. Well, it was not attached to the complaint. The second amended complaint. Correct. He got added at the time of the second amended complaint. That's right. Okay. And so all the prior policies were advanced trust, right? They were all owned by advanced trust. That's right. Okay. And they were not his. Correct. Okay. So where is his policy attached? Somewhere? You can find it at docket 121-2. We attached it to the opposition brief that we filed when protective filed its motion for judgment on the pleadings. That is that issue here. And I would add, Your Honor. Opposition brief to motion for judgment on the pleadings. Correct. And that has his name on it? It's not an exemplar? It's his policy? It's his policy, yes. And I would add, Your Honor, that the analysis doesn't change whether you look at the advanced trust policies or the Worth-Johnson policies. These are foreign insurance policies where all the key language is used. It may or may not matter, but I think it does matter. Okay. Sure. Here are the all exemplars is what I say. I think you need to have your policy there. Absolutely. Okay. I just meant that none of our arguments were specifically tied to one policy. What I have trouble with is finding an obligation, a legal obligation here in the four corners of this contract to adjust the rates on a particular schedule as opposed to this. I've got to have a term of a contract I'm able to enforce. And I'm having trouble just in the basic contract law finding what I'm enforcing in this contract as a legal obligation on one party here. And tell me the best language. Is it will be determined? Is it that language based on? Is it that one paragraph? I look to define that. Two places, Your Honor. Yes, the first place would be the language and the cost of insurance rates provision. Okay. Page 11 at the top there. Okay. That's right. And that's where it says that. Will be determined based on. Okay. And specifically monthly cost of insurance rates will be determined based on. So they've got to do this every month. Well. That's their legal obligation. Their legal obligation, Your Honor, in terms of frequency is to change or revise the COI rates whenever their expectations of future mortality experience change. So. Wait a minute. When their, our expectations, that's another problem I have. Yeah. Their expectations. What is our expectations? That, to me, is not an enforceable standard. Well, EFME. Our expectations. What does that mean? EFME is a well-known actuarial term. It's well-known internally. It could be based on anything. Our expectations that Alabama is going to win by seven points. Everybody knows they win. So what does that mean? That doesn't mean anything. Protective has all kinds of guardrails because of the nature of its business. What has? Protective has all. I'm not looking at that. I'm looking at the four corners, not guardrails I have. I'm looking for something I've got to order them to comply with. Right. And so that's one sentence. Where's your other sentence? The other sentence, Your Honor, is on the page before in the cost of insurance provision, which says that cost of insurance is determined at the end of each policy month. But I do want to draw. Okay. But it's very interesting because as I understand it, the premium is a three-month premium, right? I'm not sure about that, Your Honor. And then you deduct from it the cost of insurance for that quarter. And so cost of insurance is something that is calculated on a quarterly basis. Am I wrong about that? The claim language of the policy says that cost of insurance is determined at the end of each policy month. Well, I know, but the cost of insurance, you've got to go to where you take the cost of insurance from the premium, I assume. Is that how it works? You take this fixed premium for the quarter, and then you deduct the cost of insurance, right? It works a little bit differently. And the administrative factor and the expense factor. And then what's left over you put in like a whole life, and you start getting interest on it. Is that wrong? That's roughly right except for the fixed premium part, the unique nature of these policies. Okay, let me just help with the part. That premium is a quarterly premium, right? The insured has discretion about when and how much to pay as a premium. I know they can always prepay early. That's not what I'm asking. I don't think they're obligated to pay on a quarterly basis. They're not obligated to pay more than a quarterly basis. They have to pay quarterly. But they're not required to pay monthly. It is up to the insured when and how much they pay their premiums. If they don't pay sufficient premiums to cover the monthly deductions that are coming out of the policy. Okay, you've answered my questions. You're over. I think you need to save your time for rebuttal. Thank you. Okay, thank you. Mr. Niman, you've got 15 minutes. Good afternoon. Excuse me. Good afternoon, and may it please the court. As Judge Hull noted, advanced trust is now out of the case, and that brings us down solely to South Carolina law. The plaintiffs say in their brief correctly that in South Carolina, the doctrine of contraproferendum is a matter employed by the court only as a last resort. That means a bunch of things, but critically it means that when the courts construe a contract like this one, they look to all available tools of interpretation before simply declaring the contract ambiguous. When we do that here, several promises about cost of insurance rates are apparent from this text, from its grammar, from its context, from its structure. Just not the promise that forms the very theory of this lawsuit. The promises that are apparent from the grammar, context, and structure instead, as Judge Hull's questions to Mr. Balla, I think, suggested, are largely about protecting policyholders from arbitrary increases in rates. And to be clear, despite all the talk of a one-way ratchet here, has never changed the tables of rates that it issued at the time of policy issuance here. It has never increased its rates, and the plaintiffs concede that they are not challenging the initial rate tables that were put together at policy issuance here. That distinguishes this lawsuit from the vast majority of cases that are cited in plaintiff's briefs to this court, which deal with either increases in rates or challenges to the initially set rate tables. And that's important. Wouldn't there be a much clearer way, though, if the purpose of this policy was to set a rate and then have that rate not change? Wouldn't there be a much clearer way to do that than to say we'll reevaluate the COI each month? Judge Grant, I mean, first of all, the purpose of the policy is emphatically not to set a single rate and never have that change. Just as a matter of fact, that's what's happened with respect to the administration of protective policies here. I guess their argument is, well, sure, it hasn't changed, and it should have gone down. Well, so that's one of their arguments. And let's look at what promises are actually discernible from the text of this particular provision. The most obvious one is the one that Judge Hull pointed to, that rates can't go above the maximum set forth on page 3A. But what is not apparent from the text is this very different promise that you're alluding to, Judge Grant, this notion that protective has to periodically reevaluate these rates, that it has to yank the rates not only down, I'd suggest, Judge Grant, but also up, according to plaintiff's theory, and ask judges and juries to effectively become insurance actuaries at unspecified periods. Even now, the litigation proponents in oral argument at the 11th Circuit can't articulate when these supposed periodic reevaluations must occur. And at every turn, the policy language, read as South Carolina law requires, points to no continuing duty. Language like determined by us. Language, as Judge Hull suggested, like subject to our expectations. And language, as the district court observed, like any change. That makes plaintiff's theory implausible under South Carolina law. Now, let's turn, if we can, to the single sentence on which Mr. Bala stakes his case, the third sentence of the cost of insurance rate paragraph. Everything hinges for the plaintiffs on the notion that the word will always, in their words, has an unmistakably mandatory character, but that's just not right. Dictionaries show that the word will can mean, in context, can or having the capacity to. So when we say we'll deal with that problem later, we are saying that we can deal with the problem if we have to, but we're pretty unambiguously saying that we hope that we actually never will deal with the problem because it won't manifest itself. So in that circumstance, will means can. That's the meaning of the word will that is apparent from both the grammar, the context, and the structure. You're going to have to start that over. I heard a lot of words, but not very many that were in the contract. So tell me what's in the contract and then really simply what you think it means. Okay, so the key sentence on which plaintiffs fixate says that rates will be determined by us based on our expectations regarding future mortality experience. Their claim is that will always means mandatory and means mandatory there. Let's look at the grammar and syntax of that sentence first. It's important that the sentence is in the passive. It's important that immediately following the words will be determined are the words by us. Those words, especially by us, are there precisely because this sentence is not about mandatory duty or really so much about when rates are changed but who changes the rates. It's protective, not the 1980 CSO table, not the Society of Actuaries, not a regulator, not policyholders. But is it reasonable to think that the insurance company, in light of all of these sources, has determined every single month that their expectations as to future mortality experience have not changed? The point, Judge Grant, is that those words by us say to the policyholder, protective is the one that can make the determinations, not anybody else. But based on our expectations. So if we follow your argument all the way, then I think we have to conclude that the insurance company's expectations have not ever changed about future mortality experience. No, Judge Grant, because as Judge Hull's question suggested, there's no language in this contract that actually provides for a period in which protective has to reevaluate those initial expectations. There's no time period in which a redetermination of rates would be made. Why does the page before the cost of insurance that's determined at the end of each policy month, why doesn't that do the work that your friends at the other table say? Because that paragraph is about the cost of insurance charge, which is determined each month. But that's because the cost of insurance charge is something wholly different from the cost of insurance rate. The cost of insurance charge is something that can be determined with math. You plug numbers into a formula. You can immediately come up with the right number. Cost of insurance rate is developed through an exercise of actuarial judgment. Those paragraphs don't work together at all, is what you're saying. Well, Judge Grant, they do speak to each other in the sense that to determine the cost of insurance charge, on what in my head is .11 at page 15, to determine the cost of insurance charge, you plug in the cost of insurance rate into a formula. So there is some talk between the two sections. But in terms of when those things are determined, there's actually a pretty stark distinction drawn by those two paragraphs. The cost of insurance charge paragraph says the cost of insurance, the charge, is determined at the end of each policy month. So that language is expressed. You have the determination at each policy month. Go to the cost of insurance rate provision. The language is quite different. It says that the monthly cost of insurance charge will be determined by us based on our expectations as to future mortality experience. So no language there saying will be determined by us at the end of each policy month. There's a good reason why it doesn't do that. It would be virtually impossible to exercise in that sort of actuarial judgment at the end of 30 days. The notion that we can determine in light of experience that happens over the course of four weeks, how that experience will change rates going forward is fanciful. And I don't think the plaintiffs would even be able to put, would suggest that an expert would stand up and say that you can reasonably engage in the determination of cost of insurance rates at the end of 30 days. I just want to make sure I understand the process, because it sounds like you're saying that protective enjoys discretion as to whether and when it's going to reevaluate those calculations. And so what protection is embedded in that discretion for the insured, to make sure that that analysis isn't only done when it benefits the insurance company? Well, Judge Abudu, first of all, in terms of the facts of this case, the proof is in the pudding. Protective hasn't increased cost of insurance rates despite events that could have been, someone might suggest could have led them to, such as COVID-19, for example. In terms of this notion, as Mr. Bala puts it, that it's a one-way ratchet and unfair, I think the answer to that is no. This is simply the way that, part and parcel of the way that insurance contracts allocate risk. As Judge Hull's question suggested, protective agreed at the outset of this policy that it would never take the rates above the maximum cost of insurance rates specified in detail on page 3A of the policy. That meant protective took on some risk. And if the market cost of insurance rates had, in fact, gone far above those maximum rates, protective would have been stuck with those maximum rates. Let me stop you there because he did explain something I had not figured out. These rates are the maximum and were like the 0.158 and it goes 159, 157. So the rates are all delineated. But did they actually charge less than those rates on page 3A or did they charge the rates that are shown there? Yeah, I think fair inference and I think it's fair to say that the initially set cost of insurance rate tables, which are not challenged by the plaintiffs. On 3A, applied throughout the policy. No, no, so on page 3A is the table of maximum rates. Maximum rates. And the promise protective is making is It won't go above that. If we ever do engage in a change, I'm not going to go above that. The initial rates are likely Okay, so there were some years, we don't know because we just have judgment on the pleadings, there were some years it was less than those rates. Yes, I think that's fair to say, Judge Holt. But I actually think that that's a really compelling reason. If we engage in sort of, take into account structural considerations, that the plaintiff's theory of this continuing duty simply can't be a plausible reading of the words will be determined. I don't understand. You were saying before that monthly would not be a way to do it. But this very paragraph that you're referencing says, Monthly cost of insurance rates will be determined by us based on our expectations, etc. Any change in the monthly cost of insurance rates will be on a uniform basis for insurers of the same class, etc., etc. So what am I missing? Why is monthly not a time period that is relevant? We'll compare the use of monthly there with the way that policy month is expressed in the previous paragraph, Judge Grant. The only reasonable way to read the word monthly cost of insurance rate is as a descriptive term explaining when the rates are applied. The cost of insurance rate charge provision says that every month the charge is determined. You look at the monthly rate to determine that charge each month. But it's simply a descriptive term to make sure that the policyholder is aware that the rates that are going to be charged there are the ones that apply for each month, reflecting projections as to that particular month, not an annual rate or the like. Why is it pretty clear that that's a descriptive term or absolutely clear? I would say look at the rest of the cost of insurance rate paragraph. Repeatedly, the cost of insurance rate paragraph refers to this as the monthly cost of insurance rate. Not only in the sentence that says that monthly cost of insurance rates will be determined by us, but also the first sentence. The monthly cost of insurance rate is based on those factors. Any change in the monthly cost of insurance rates will be, the policy says. That means that monthly there is a descriptive term explaining that those rates are applied each month, not that the rates are determined each month. It says monthly cost of insurance rates will be determined by us. That suggests that that's a monthly determination, doesn't it? No, no. For the precise reasons I just mentioned, the word monthly there is serving as a descriptive term to explain that that cost of insurance rate is applied each month, not that it's redetermined each month. If it were to be determined each month, then that sentence would say that cost of insurance rates will be determined by us each month, or at the end of each policy month, just as the previous paragraph did. Plaintiffs have said in their briefs that we have to assume that variations in language have meaning in this policy. That variation in language is there because the charge is determined each month, whereas the cost of insurance rate that we're talking about is the one that's applied each month but not redetermined each month. Otherwise, the next sentence that says any change wouldn't make any sense, because it would mean that the cost of insurance rate is changed every single month, and we wouldn't have things like the cost of insurance rate tables that plaintiffs concede were issued at the beginning, or were used at the beginning of this policy's issuance and that they don't challenge. Two things. One, do you think there's ever any obligation to change the rate or any allowance to change the rate? If so, where is the language that says when that happens? Your first question was, is there an obligation to change the rate? The answer to that question is no. Protective doesn't have an obligation. It's simply not in the language of the policy. Right, so where's the allowance in your view to change the rate if you have no obligation to do so? The sentence, monthly cost of insurance rates, will be determined by us. And the next reference, any change in the rates. So the policies clearly contemplate that protective can change the rates. That's the right way to read the words, will be determined there considering the syntax of that sentence. But based on that language, how often would you say that the company can change the rates? The policy does not say how often protective can do so. As I said before, there are clearly some limits in the policy in terms of the amount by which protective can change the rates. So it can't go above the maximum rates. It also, I think it's completely reasonable and, in fact, correct to say that if protective ever does change the rates, its determinations have to be based on its expectations regarding future mortality experience. But none of that speaks to the frequency, which South Carolina law, of course, requires any enforceable contract to contain a provision that speaks to frequency. Could they change every week? Well, that seems unlikely, Judge Grant, because- No, I mean, it might not be a good idea to, but could they under this contract? I don't think there's anything in the contract that forbids protective from changing, from in week one, changing the cost of insurance rate to X, and then in week three deciding, oh, we made a mistake, we need to change it to something else. I can tell you it's pretty implausible that that would happen, that you would have a two-week period in which protective changed the rate once and then changed it again, because these rates are calculated considering long-term considerations relating to mortality and all sorts of other considerations that can't be discerned at the end of each month. It's not like there's a website that you go to each month and determine and pick out the various factors that will go into this sort of rate. This is an exercise in actuarial judgment that takes a lot longer than a week or two weeks. Well, that was my next question. What, in your view, does base our expectations as to future mortality experience? What kind of sources or variables go into that? That is this Court's decision, which Mr. Bala didn't mention in Slam Dunk. In Slam Dunk, the Court says that there's no connotation of exclusivity. No, I get it, but what's your position of, in reality, what sources that includes? It's obviously more than a vibe, right? What does the insurance company look at to make that determination? There are at least two different answers depending on which sentence we're looking at. The plaintiff's theory in this case is that the first sentence that says the monthly cost of insurance rate is based on the sex, attained age, and rate class of the insured, and the policy year is what governed the initial setting of rates. So the rate is going to be determined in part by those factors, but other things as well. I don't think that the plaintiff's contention in this case is that those are the only factors that are rate. What I'm asking is a little bit different. What I'm asking is what fills in the expectations as to future mortality experience? Under the plaintiff's theory, that's... I want to know your theory. Their theory is that that's the factor that governs changes. Changes have to be based on expectations regarding future mortality experience. Slam Dunk and the Seventh Circuit's decision, albeit an unpublished one, and the Seventh Circuit's decision in Norum say that's not an exclusive list. Yeah, I've heard both of those. But what I want to know is what you and the insurance company say fits within based on our expectations as to future mortality experience. It can include non-mortality-related factors. It's not just a projection of... I'm not even asking if it's exclusive. I'm just asking whether that is exclusive or not. What fits in that particular phrase? What sources go for the insurance company to base its expectations as to future mortality experience? I would define that term as the projected cost of providing insurance to an insured. Those projected costs are going to be the likelihood. They're going to account for the likelihood that Protective will sustain the cost associated with payment of the policy proceeds. Are there certain sources that they use to project those costs? Protective engages in actuarial judgment to determine, for example, what they think the mortality rate may look like. But also things like the plaintiff's allege. These are allegations of the complaint. The notions of persistency, in other words, how likely the policy is to be held on to. You could project that somebody's chance of death is X percentage, but if it turns out they're unlikely to hold on to the policy the entire time, they're going to move on to some other investment or the like, then that's going to affect whether the ultimate cost that Protective is going to sustain with respect to providing that insurance. Okay. Do you agree with him that Mr. Johnson's policy is in the record? It was attached to the response to the motion for judgment on the pleadings, and you all haven't objected to it, so we can look at that policy. Right, of course. Yes, I agree with him on that. Okay. And so we have his policy in this record? Yes. Okay. And does it provide for premium? I don't have it right here. I have one of the other ones, I think. The premium is payable quarterly, 128, 31, at least with this one. Is the premium payable quarterly here or monthly under these policies? So Mr. Johnson's plan, as I understand it, he set it up so that he would pay quarterly. Okay. Yes. I don't disagree with Mr. Bala that Mr. Johnson has some discretion in terms of Okay, you can pre-pay. You can always pay more to make a greater investment. Yes. You can pay more than your premium cost to get. Okay, got it. And my only last question is just to be clear. So other than the rate cap that Protective agreed to, is there anything else? Well, it sounds like under your interpretation of the provision, Protective can always increase the rate as long as it doesn't go past the cap, but there's nothing to require Protective to decrease the rate in any given time period. Is that accurate? As to the latter part of your question, Your Honor, yes. There is an additional safeguard that is built into the contract, which is that if Protective increases the rate, not only can it not go above the maximum table of rates that are specified on page 3A, but also that determination has to be based on its expectations regarding future mortality experience. I didn't talk a lot today about what factors Protective can take into account in addition to expectations regarding future mortality experience, but that's nonetheless a meaningful safeguard that's provided to the owners and the insureds under the text of this policy. What's not there is a promise that Protective will ever decrease the rates. That's simply not what will be determined means in terms of grammar, context, or structure here. I'm far over my time, Judge Grant. Thank you. Thank you. Mr. Bali, you're reserved two minutes. Thank you. I just want to clarify a few things about EFME. EFME is a well-known term in the industry, and it's certainly a well-known term within Protective. It's not a mystery what Protective's EFME is. It's something that Protective carefully studies, stores, and updates every year and incorporates into its financial reporting. So in terms of the workability of a duty based on EFME, I think it's very workable because Protective knows when it updates its EFME, and that is the event that triggers the duty. That would be true if it says based on EFME, but it says based on our expectations. That is what EFME is. EFME is expectations of future mortality. But it says our expectations, Protective's expectations. Right. But this is precisely the kind of thing that a life insurance company has a lot of reasons to get right. Well, I'm just going, I don't know about how to run a life insurance company, but I am going on a contract, and it doesn't say based on, you know, mortality tables that are updated every five years or whatever they are. I mean, it could have said based on calculations of life expectancy. I mean, there's a lot of things it could say. Right. This seems very vague to me. And that's what I'm hopefully trying to respond to, Your Honor, is that it's not a vague concept or a vague number. EFME is something that Protective and all other life insurance companies in the industry know and maintain, study, and revise. How often is EFME generally revised? Is that based on actuarial tables that are adjusted year over year or are companies constantly looking at it and you have to pick a day to calculate? How does that work? It's a fact question, of course, Your Honor. But here what we allege is that Protective does it every year, and that's paragraphs 5 and 30 of the complaint. So how does that fit with your monthly argument? Well, and that's what I wanted to get to, Your Honor, is that I think there's a difference between how frequently Protective's duty to revise CUI rates comes up and this question of how frequently is Protective determining the rates for the monthly charge. On the first question, Protective is obligated to revise the rates as often as its EFME changes. So if EFME changes at the beginning of the year, that triggers the obligation to revise the CUI rates. There's a separate aspect to this of the mechanical determination that Protective is making using the CUI rate to make a monthly deduction from the policyholder's account. That deduction ultimately does need to reflect the revised CUI rate, but the duty that we are really focused on here and that I think is sufficient to have shown the Protective breach at the pleading stage is that Protective never revised the CUI rates down after it issued the policies even though mortality has dramatically improved and even though those rates said they would be determined based on EFME. The last point I just want to add, Your Honor. They don't say determined. I mean, they don't say redetermined. They say will be determined. They don't say redetermined monthly. I don't think it needs to say redetermined on either side. But it's determined at the beginning of the policy, right? They're projected at the beginning of the policy. No, there's a specific number that's there at the beginning of the policy. For the first month, maybe, yes. I thought for the first year. It might be for the first year, but there might be a period of time where Protective knows, yes, this is the CUI rate we're going to use in the next month's CUI charge. But that rate is subject to revision whenever its EFME improves. That's the fundamental duty that Protective did not meet throughout the life of the policies. And we don't have to decide that that is the only reading in the contract, right? At this stage, we just have to decide whether it's a reasonable reading. Absolutely. And a reasonable reading, yes, is all we need. And it brings me to the last point I was going to make, Your Honor, is that we have kind of a unique natural experiment here where we had two different judges below read the same policy and come to opposite conclusions about what the duty is. So at the very least, there's an ambiguity in what the duty is, and that would also get us over the motion for judgment on the pleadings. The only way that we lose is if this court finds no reasonable insured would read the policies the way that we do. And for all the reasons we've discussed today, we don't think that that is the correct result, so we'd ask that you please vacate the district courts. Thank you. We appreciate counsel's arguments today, and we are going to be discussing it until tomorrow.